UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   SEP 11 2019   ★

LONG ISLAND OFFICE

------------------------------------------------------------X
YVETTE CLAY,

                            Plaintiff,

                -against-                              ORDER
                                                      17-CV-2251(SJF)(AKT)

COUNTY OF SUFFOLK, SUFFOLK COUNTY
SHERIFF'S OFFICE, SHERIFF VINCENT F.
DeMARCO and CHIEF DEPUTY SHERIFF
MICHAEL P. SHARKEY,

                            Defendants.
------------------------------------------------------------X
FEUERSTEIN, District Judge:

I.      Introduction

        On April 14, 2017, plaintiff Yvette Clay ("plaintiff" or "Clay") commenced this

employment discrimination action against defendants County of Suffolk ("the County"), Suffolk

County Sheriff's Office (the "Sheriff's Office"), Sheriff Vincent F. DeMarco ("DeMarco") and

Chief Deputy Sheriff Michael P. Sharkey ("Sharkey") (collectively, "defendants"), pursuant to,

*inter alia*, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112(a); 42

U.S.C. § 1983 ("Section 1983"); Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e, *et seq.*; and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec.

Law § 296, *et seq.*, alleging discrimination and retaliation on the basis of her disability, gender

and sex, and deprivation of her right to equal protection of the laws in violation of the Fourteenth

Amendment to the United States Constitution and Article I, Section 11 of the New York State

Constitution. Pending before the Court is defendants' motion for summary judgment pursuant to

1

Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants'

motion is granted to the extent set forth herein.

II.     Background

A.     Factual Allegations[1]

Plaintiff was hired by the Sheriff's Office as a deputy sheriff in 2006, (Defendants'

Statement of Material Facts pursuant to Local Civil Rule 56.1(a) ["Def. 56.1"], ¶ 3; Plaintiff's

Counterstatement pursuant to Local Civil Rule 56.1(b) ["Plf. 56.1"], ¶ 3); and her first unit

assignment was in the Central Islip District Court, where she remained until 2013. (Def. 56.1 ¶ 4;

Plf. 56.1, ¶ 4).

In 2013, plaintiff, as the senior deputy applying, took a temporary position in the

Rotating Hospital Squad at headquarters to replace Deputy Sheriff Pamela Lettieri ("Lettieri"),

who was out on maternity leave. (Declaration of Daniel E. Furshpan, Esq. ["Furshpan Decl."],

---

[1] The factual allegations are taken from the pleadings and the parties' statements pursuant to Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Civil Rule 56.1"), to the extent that they are properly supported pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. *See* Local Civil Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."); *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 305 (S.D.N.Y. 2015) ("[I]f a party fails to properly support a statement by an adequate citation to the record, the Court may properly disregard that assertion."); *F.D.I.C. v. Hodge*, 50 F. Supp. 3d 327, 343, n. 2 (E.D.N.Y. 2014) ("Statements without citation to evidence may be properly ignored by the court."); *Kaur v. New York City Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 322 (S.D.N.Y. 2010) ("Where there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." (quotations, alterations and citation omitted)). Moreover, only those facts that are material to the disposition of the motions, *i.e.*, that "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), are set forth herein. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" (brackets in original) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505)). The following facts are undisputed unless otherwise indicated.

Ex. E at 36, 52; and Ex. F at 13-14). Plaintiff testified that she took that position "with the understanding that it was temporary;" and that she was told that she "would be treated exactly like the other male deputy who took the spot prior for the same person, that when the spot expired, there would be a posting listed and you will stay there until the next permanent spot becomes available that you can get." (*Id.*, Ex. E at 52-53). According to plaintiff, "[t]he other deputy stayed in the Hospital Squad, he is a male, for five months until they posted a spot for him and he ended up going to Transportation of equal pay, so [she] was told the same would happen to [her]" by the union and the captain.[2] (*Id.* at 53).

Rotating Hospital Squad is divided into Squads "A," "B" and "C," generally consisting of two (2) deputy sheriffs per squad. (Def. 56.1, ¶ 6; Plf. 56.1 ¶ 6). Plaintiff filled Lettieri's spot on Squad "C," as the partner of John Risley ("Risley"). (Def. 56.1, ¶ 7; Plf. 56.1, ¶ 7). Plaintiff's primary duties were: "[i]ntake of prisoners, transporting of prisoners. Taking them to the hospital. Taking them back to the jails, picking them up from the jails in the morning and basically bringing them to court or anything else they basically asked us to do. . . ." (Def. 56.1, ¶ 8; Plf. 56.1, ¶ 8). Plaintiff's immediate supervisor was Lieutenant Peter Williams and her commanding officer was Captain Colleran. (Def. 56.1, ¶ 9; Plf. 56.1, ¶ 9). Sharkey was, and remains, the chief deputy sheriff. (*Id.*).

In February 2015, plaintiff was diagnosed with endometriosis. (Def. 56.1, ¶ 10; Plf. 56.1, ¶ 10). Plaintiff testified that she told her captain that she "was going for surgery and they are going to do a full hysterectomy," but she did not tell him about the endometriosis diagnosis; nor did she tell him when she would be back to work. (Furshpan Decl., Ex. E at 48). She did,

---

[2] Plaintiff's testimony about what she was told by John Harbard ("Harbard") in May 2015, (*see* Plf. 56.1, ¶ 5; Furshpan Decl., Ex. E at 53-55), constitutes inadmissible hearsay.

however, tell him that she was "going out sick . . . [for] a prolonged period of time," (Def. 56.1, ¶ 12; Plf. 56.1, ¶ 12), and that she would report to the Medical Evaluation Unit ("MEU"), as required. (Furshpan Decl., Ex. E at 48). The MEU processes claims related to injured and sick employees; assists injured and sick employees in obtaining care; arranges for the medical review of injured and sick employees to determine their progress and capability for assignment, through consultations with employees and their treating physicians; investigates chronic employee absences; and makes the final determination of when an employee who is out sick or injured may return to duty. (Def. 56.1, ¶¶ 13-14; Plf. 56.1, ¶¶ 13-14).

According to plaintiff, she called the MEU after she was diagnosed and "explained what was going on;" then, about a week before the surgery, she "furnished them all the paperwork of [her] illness . . . what the prognosis was and how long [she] expected to be out with the hysterectomy and the follow-up to what had to be done." (Furshpan Decl., Ex. E at 45-46).

On February 21, 2015, plaintiff went out on extended leave for treatment, which included a hysterectomy followed by a series of Lupron injections, a form of chemotherapy. (Def. 56.1, ¶ 15; Plf. 56.1, ¶ 15). Plaintiff was told by her doctors that treatment would last approximately six (6) months, a "ballpark" figure that could change depending on the progress of her recovery. (Def. 56.1, ¶ 16; Plf. 56.1, ¶ 16). Plaintiff's surgeon, Dr. Patton, told her that treatment would last ". . . a ballpark six months, you know . . . unless it's catastrophic . . . that was his thing, a ballpark six months and the six months was due to chemotherapy shots." (Def. 56.1, ¶ 17; Plf. 56.1, ¶ 17).

Plaintiff never informed her chain of command of her diagnosis, the Lupron injections, how long treatment would last, or when she expected to return to work. (Def. 56.1, ¶ 18; Plf. 56.1, ¶ 18).

In May 2015, while still out on medical leave, plaintiff sought treatment with Dr. Ruggiero, a general practitioner associated with Peconic Bay Primary Medical Care P.C. ("PBMC"), because she "started getting really sick." (Def. 56.1, ¶ 19; Plf. 56.1, ¶ 19). Plaintiff testified that her immune system crashed, (Def. 56.1, ¶ 20; Plf. 56.1, ¶ 20), and the records from PBMC indicate that she had Lyme's disease. (Def. 56.1, ¶ 21; Plf. 56.1, ¶ 21).

During Dr. Ruggiero's examination on July 22, 2015, plaintiff exhibited "joint pain, swelling, stiffness, fatigue, numbness and tingling." (Def. 56.1, ¶ 22; Plf. 56.1, ¶ 22). Plaintiff was still not cleared to return to work. (*Id.*). Dr. Ruggiero issued a note to the MEU indicating, "[Plaintiff] was seen in my office on 7/22/15. She will be out till [sic] 8/27/15. At that time she will be evaluated. Any questions feel free to call my office." (Def. 56.1, ¶ 23; Plf. 56.1, ¶ 23). Plaintiff testified that Dr. Ruggiero told her she would be able to return to work in "about a month." (Def. 56.1, ¶¶ 24-25; Plf. 56.1, ¶¶ 24-25). Plaintiff did not inform anyone up her chain of command of what Dr. Ruggiero had told her. (Def. 56.1, ¶ 26; Plf. 56.1, ¶ 26).

On July 9, 2015 and August 5, 2015, respectively, Sharkey posted notices to all deputy sheriff personnel that openings would soon be available in various commands. (Def. 56.1, ¶ 31; Plf. 56.1, ¶ 31). Transfer requests are based on seniority. (Def. 56.1, ¶ 32; Plf. 56.1, ¶ 32). Specifically, Section 26 of the Collective Bargaining Agreement ("CBA"), entitled "Transfers," indicates, in pertinent part, ". . . in case of transfer, strict seniority shall prevail, unless the Sheriff's Office establishes that the senior applicant does not possess the minimum qualifications

for the job." (Def. 56.1, ¶ 32; Plf. 56.1, ¶ 32). The notices were posted while plaintiff was still out on medical leave without a definitive return date. (Def. 56.1, ¶ 33; Plf. 56.1, ¶ 33).

On or about July 12, 2015, and continuing through August 7, 2015, plaintiff placed certain transfer/reassignment requests to her superiors, including Sharkey, wherein she requested reassignment to one of the following positions: "Rotating Hospital shift (first choice);" "Midnight Hospital (second choice; two openings);" or "Main Squad (third choice)." (Complaint ["Compl."], ¶ 22; *see also* Furshpan Decl., Ex. E at 66-67, and Ex. F at 68). Plaintiff testified: "The Hospital Squad was my first request and it always goes by seniority, so you write one, two, three and you get the transfer by seniority, so if my first preference if I wasn't the first person, I would go to my second choice or my third choice, so I put in for Hospital Squad. I was a senior deputy. I was skipped. The second choice was Hospital Squad midnight." (Furshpan Decl., Ex. E at 66). When plaintiff put in her transfer request, she was still out on medical leave without a definitive return date. (Def. 56.1, ¶ 35; Plf. 56.1, ¶ 35).

During the MEU's examination on August 11, 2015, plaintiff exhibited "lower abdominal tightness and intermittent discomfort and bowel irregularities. Generalized weakness, arthalgias [sic] and joint swelling. No abdominal pain. Admits to improvement of her GI symptoms without diarrhea or mucus. No fever." (Def. 56.1, ¶ 27; Plf. 56.1, ¶ 27). The MEU report indicates that plaintiff would "follow up in one month for duty status." (Def. 56.1, ¶ 28; Plf. 56.1, ¶ 28). According to plaintiff, the MEU told her that if Dr. Ruggiero cleared her to work during her next visit with him on August 27, 2015, they would agree. (Def. 56.1, ¶ 29; Plf. 56.1, ¶ 29). Specifically, plaintiff testified as follows:

> Q.    So they said if you go back and you're evaluated and cleared to return to work, they [the MEU] would agree?

A. Yes.

Q. By that same token if you went back and they determined you were not ready to go back, they would not clear you; correct?

A. Yes, correct.

(Def. 56.1, ¶ 30; Plf. 56.1, ¶ 30).

Sharkey is responsible for handling transfer requests. (Def. 56.1, ¶ 36; Plf. 56.1, ¶ 36). According to Sharkey, when plaintiff's transfer requests were submitted for his review, he "only knew that she was out on medical leave without a date certain of return[,] . . . [and] did not know the reason she was out, her diagnoses, course of treatment, or when she planned to return to work." (Furshpan Decl., Ex. H, ¶ 3). Plaintiff testified, in relevant part, as follows:

Q. Did you ever personally reach out to Chief Sharkey about returning to work?

A. No. That's not in my job description. I don't talk to chiefs.

Q. What about Captain Colleran, did you ever reach out to him to let him know when you'd be returning?

A. No. That's for MEU to do. . . .

(Def. 56.1, ¶ 38; Plf. 56.1, ¶ 38).

Sharkey testified that in 2015, he discussed plaintiff and the "transfer requests that were coming due" with the undersheriff, John Meyerricks, and the director of employee relations, Robert Draffin, "to ensure that [his] understanding of the practices was accurate. . . ." (Furshpan Decl., Ex. G at 56, 60, 64). According to Sharkey, those individuals confirmed his understanding "[t]hat the practice had been that if an employee is not currently at work or with a date certain of

return, th[ey] would be bypassed as unavailable for transfer." (*Id.* at 56-57). Sharkey further testified as follows:

> Q.     What was the basis for your understanding that this was the policy?
>
> A.     It had occurred in the past. It had occurred infrequently and I had come across it as a union board member, and this was the first time it was coming across my desk in my capacity as chief deputy sheriff.

(*Id.* at 57). According to Sharkey, to his knowledge, that policy is not written anywhere. (*Id.* at 59). Sharkey did not recall the name of any person who was previously passed over for a transfer based upon that policy, (*id.*), but testified that he recalled one (1) employee, Fanning, who was out on "a 9/11 related issue," whose transfer request was granted "[a]fter some discussion with the Union, . . .because it was something [Sharkey] was aware of." (*Id.* at 64-65).

Sharkey testified that plaintiff and a male deputy sheriff, Deputy Sheriff Bartz ("Bartz"), filed similar grievances having "to do with the transfer language section of the [CBA] and . . . assert[ing] that they were passed over to a less senior member." (Furshpan Decl., Ex. G at 61-62). According to Sharkey, Bartz was also passed over because "[h]e was not at work. He was out of work, as well." (*Id.* at 62).

Sharkey testified that in order to ascertain whether a particular employee had a date certain to return to work, he would generally contact the MEU. (Furshpan Decl., Ex. G at 62-63, 66-67). According to Sharkey, he receives "regular lists from MEU so [he] would know who's out." (*Id.* at 67). Sharkey further testified that he recalled "calling and inquiring as to whether [plaintiff] and Deputy Sheriff Bartz had dates to return – dates certain to return to full duty[,] . . . [and] [he] was told that there was an upcoming doctor's appointment with [plaintiff's] personal doctor but there was not a certain date for her to return to work." (*Id.* at 67-68; Def. 56.1, ¶¶ 41-

42; Plf. 56.1, ¶¶ 41-42). According to Sharkey, neither plaintiff nor Bartz could be considered for the posted positions because they were out on medical leave and did not have a date certain of return to work, (*id.*, Ex. H, ¶¶ 4-5); and "[t]he positions were filled on August 21, 2015 based on seniority and availability to work. . . ." (*Id.*, ¶ 6). According to plaintiff, since the positions were filled by persons with less seniority than her, the transfers were made in violation of the CBA. (Plf. 56.1, ¶ 45).

A female deputy sheriff was given the Midnight Hospital Squad position. (Def. 56.1, ¶ 46; Plf. 56.1, ¶ 46).

Plaintiff was ultimately cleared to return to work by PBMC on August 27, 2015, and by the MEU on August 28, 2015. (Def. 56.1, ¶ 47; Plf. 56.1, ¶ 47). Plaintiff's first day back to work was September 11, 2015. (*Id.*).

The following text messages were exchanged between plaintiff and Lettieri on September 8, 2015:

| Plaintiff: | As long as they pay my lawyer fees. And our [sic] put on notice that this will not be tolerated. [sic] I'm covered under this law 4 [sic] the rest of my life. They can't retaliate. Or more damages. |
|---|---|
| Plaintiff: | I choose to settle. Not them. I choose the terms. |
| Lettieri: | I think your [sic] in for a handsome reward then. |
| Lettieri: | They picked a bad time Re [sic] election year and all |
| Plaintiff: | Not much money. Or damages yet. But the more they continue. The more money it is. They are on notice now. |

(Def. 56.1, ¶ 77, Plf. 56.1, ¶ 77).

Before plaintiff was cleared to return to work, Lettieri returned from maternity leave back to her position on Squad "C." (Def. 56.1, ¶ 48; Plf. 56.1, ¶ 48). Plaintiff's position on Rotating

Hospital Squad was temporary and contingent upon Lettieri's return from maternity leave. (Def. 56.1, ¶ 49; Plf. 56.1, ¶ 49). Section 27(B) of the CBA, entitled "Posting," indicates, in relevant part, "If the position to be filled is as a result of a long-term illness/injury, the position will be posted and filled on a temporary basis until or unless the employee returns or it is determined that the individual is not likely to return." (Def. 56.1, ¶ 50; Plf. 56.1, ¶ 50). Nonetheless, Sharkey allowed plaintiff to stay on Rotating Hospital Squad, which was the transfer position of her first choice, instead of returning her to District Court, where her pay would have been significantly less. (Def. 56.1, ¶ 51; Plf. 56.1, ¶ 51). According to plaintiff, she returned to her "[t]emporary spot in Hospital Squad" because they made her squad "a three-person squad instead of two[,]" (Furshpan Decl., Ex. E at 85; *see* Def. 56.1, ¶ 54; Plf. 56.1, ¶ 54), and she was told that she "would stay in the temporary spot until a permanent posting comes out." (Furshpan Decl., Ex. E at 87). Plaintiff did not suffer any pay decrease, lost benefits or wages, or loss in rank as a result of the denial of her transfer requests. (*See* Def. 56.1, ¶ 53; Plf. 56.1, ¶ 53 [claiming only that plaintiff "lost the benefit of a permanent posting in that she would be re-assigned at will"]).

Plaintiff testified that when she first got onto Hospital Squad, it only had two (2)-person squads; and that "since its creation [Hospital Squad] has always been two person to a squad." (Furshpan Decl., Ex. F at 80-81). Sharkey testified that the squads on Hospital Squad generally consist of two (2) deputies, although "there have been occasions when there's been more than two," and there are more than two (2) people working on the 3:00 to 11:00 evening tours and the midnight tours. (*Id.*, Ex. G at 43). Other units of the Sheriff's Office have more than two (2) deputy sheriffs per squad as well, such as Transportation, which has six (6) deputies per squad. (Def. 56.1, ¶ 56, Plf. 56.1, ¶ 56).

On or about September 25, 2015, plaintiff served a notice of claim alleging disability and gender discrimination. (Def. 56.1, ¶ 75, Plf. 56.1, ¶ 75).

On September 29, 2015, *i.e.*, eighteen (18) days after plaintiff returned to work, and four (4) days after she served the notice of claim, there was an opening for the Midnight Hospital Squad, which was the transfer position of plaintiff's second choice. (Def. 56.1, ¶ 57, Plf. 56.1, ¶ 57). Plaintiff was offered to apply for that position, but she refused because its schedule "would not fit [her] lifestyle. . . ." (Def. 56.1, ¶¶ 58-59, Plf. 56.1, ¶¶ 58-59). Lieutenant Williams wrote to Captain Colleran: " . . . I spoke to D/S Yvette Clay and asked her if she knew that the posting for Midnight rotating hospital squad was to expire at 1600 hours this date [October 6, 2015[3]]. Deputy Clay informed me that she knew about it and was not putting in for it and stated[,] 'I have a spot, I'm good.'" (Def. 56.1, ¶ 60, Plf. 56.1, ¶ 60).

Plaintiff alleges nine (9) acts of retaliation against her as a result of her notice of claim. (Def. 56.1, ¶ 76, Plf. 56.1, ¶ 76).

Since plaintiff was part of a three (3)-member squad for a short period of time, on three (3) or four (4) occasions she had to commute to work in the backseat of a unit vehicle, behind the prisoner partition, because the two (2) front seats were already occupied by other deputy sheriffs. (Def. 56.1, ¶¶ 69, 82; Plf. 56.1, ¶¶ 69, 82). However, on at least fifty-four (54) occasions between September 9, 2015 and February 23, 2016, male deputy sheriffs also rode in the backseat of a unit vehicle behind the prisoner partition. (Def. 56.1, ¶ 70, Plf. 56.1, ¶ 70).

One such occasion that plaintiff rode in the backseat was on October 12, 2015, when plaintiff wanted to work overtime but there were not enough unit vehicles available, so the

---

[3] The parties' 56.1 statements erroneously indicate the date as October 6, 2016. However, the declaration and report cited in support thereof indicate that the correct date is October 6, 2015. (Furshpan Decl., Ex. O).

Sheriff's Office sent her a ride from a unit vehicle that was already occupied with two (2) people in the front to drive her to the overtime detail. (Def. 56.1, ¶ 72, Plf. 56.1, ¶ 72).

Another occasion was on October 16, 2015, when plaintiff's request for a hospital overtime detail at Southside Hospital was granted and a unit vehicle with two (2) deputy sheriffs already sitting in the front came to pick her up and drive her to the overtime detail. (Def. 56.1, ¶ 73, Plf. 56.1, ¶ 73). Plaintiff was picked up by Deputy Sheriff Marinelli and the following text messages were exchanged between them:

| Marinelli: | Hey just want to let you know we're coming to get you to bring you to Good Sam we're probably a [sic] five minutes out. |
| Plaintiff: | Ok. Got it. |
| Marinelli: | Unfortunately you're going to be the third wheel |
| Plaintiff: | No prob |

(Def. 56.1, ¶ 74, Plf. 56.1, ¶ 74).

In addition, a unit vehicle was late to pick plaintiff up for work on six (6) occasions. (Def. 56.1, ¶ 80, Plf. 56.1, ¶ 80). However, plaintiff did not lose any pay for being late to work on those six (6) occasions. (Def. 56.1, ¶ 81, Plf. 56.1, ¶ 81).

Each squad is assigned a unit vehicle with a prisoner partition. (Def. 56.1, ¶ 64, Plf. 56.1, ¶ 64). With respect to the use of unit vehicles, plaintiff testified, in pertinent part, as follows:

| Q. | Could you use your own personal [] car if you wanted to? |
| A. | They would have to pay me mileage and they don't do that. My contract requires us to have a vehicle if we're not reporting to the command. |
| Q. | But if you wanted to drive your own car, they would have to pay you back your mileage? |

12

A.    Yes.

(Furshpan Decl., Ex. F at 82).

Chief Sharkey testified, "[o]ften the person prefers to use their personal vehicle." (Def. 56.1, ¶ 66, Plf. 56.1, ¶ 66). Employees are entitled to reimbursement for mileage when driving their personal cars to somewhere other than their duty station. (Def. 56.1, ¶ 67, Plf. 56.1, ¶ 67). With respect to using her own personal vehicle, plaintiff testified, in relevant part, as follows:

Q.    Has there ever been a time where you've driven your own car to work?

A.    Maybe ten my whole career.

Q.    Those times[,] were you reimbursed for your mileage?

A.    No.

Q.    Did you put in for reimbursement?

A.    I was yelled at by the Chief. This was another Chief, not to put in for mileage.

Q.    Was it in your contract then when that happened?

A.    It was but I was told if I wanted the overtime, this is prior to 2015, that I have to take my own car.

Q.    You had to take your own car?

A.    Yeah, if I wanted to work the overtime.

Q.    We're talking about at this time before 2015?

A.    Yes.

Q.    When was this?

A.    2013.

Q.    Who was the Chief then?

A.  Chief Knitel. So that was the unwritten rule, you don't put in.

Q.  Did you ever drive your own car under Chief Sharkey?

A.  Yes.

Q.  About how many times?

A.  Maybe two.

Q.  Did you put in for reimbursement either of those two times?

A.  No.

(Furshpan Decl., Ex. F at 95-96).

Plaintiff's position on Rotating Hospital Squad became permanent on June 6, 2016. (Def. 56.1, ¶ 61, Plf. 56.1, ¶ 61).

Beginning on or about June 22, 2016, plaintiff's sergeant told her to call him the day before each work shift to ascertain which unit vehicle would take her into work. (Def. 56.1, ¶ 78, Plf. 56.1, ¶ 78). However, Sharkey never told plaintiff's sergeants that she had served a notice of claim or filed a lawsuit. (Def. 56.1, ¶ 79, Plf. 56.1, ¶ 79).

Plaintiff's overtime request was denied on one (1) occasion in June 2016, although her partner, Risley, was pre-authorized a half hour of overtime to pick plaintiff up for work because he had to drive out of his way to get her. (Def. 56.1, ¶ 83, Plf. 56.1, ¶ 83). With respect thereto, plaintiff exchanged the following text messages with Risley:

Risley:     I just got a call from sgt walker [sic] he asked me to start a half hour early to pick you up so I will leave my house at 6:00

Plaintiff:  Yes. I told him I don't have a car. He called me to report to Huntington. Is that ok to start early.

Risley:     He said he will pay me to leave early since I have to drive east to go west

(Def. 56.1, ¶ 84, Plf. 56.1, ¶ 84).

In addition, plaintiff, and others in Hospital Squad, worked overtime in the Transportation Department on three (3) occasions in August 2016. (Def. 56.1, ¶ 85, Plf. 56.1, ¶ 85). Plaintiff was on vacation for the entire month of August 2016, but had put in a request for "manpower overtime," which is overtime in any department or unit of the Sheriff's Office that needs assistance. (Def. 56.1, ¶ 86, Plf. 56.1, ¶ 86). Plaintiff was granted overtime and placed in the Transportation Department. (Def. 56.1, ¶ 87, Plf. 56.1, ¶ 87).

The MEU investigated a sick leave that Plaintiff took in July 2016. (Def. 56.1, ¶ 88, Plf. 56.1, ¶ 88). The MEU is staffed with investigators to investigate chronic sick leaves, workers' compensation claims, and other matters. (Def. 56.1, ¶ 89, Plf. 56.1, ¶ 89). Plaintiff testified, in pertinent part, as follows:

> Q.     When did they contact your doctors?
>
> A.     What I found out is I went to the doctor the end of July and I see it said County numbers, Investigator Johnson on my note in my file . . . .
>
> Q.     So they reached out to your doctor for information but the doctor wouldn't give it to them as a violation of HIPAA rights?
>
> A.     Yes.
>
> Q.     It was an Investigator?
>
> A.     Yes.
>
> Q.     Do you know who the Investigator was?
>
> * * *
>
> A.     This is the problem. On the note it said Investigator Johnson. I called Investigator Johnson, he knew nothing of it. . . .

* * *

Q.      But has anyone at MEU contacted your doctors to investigate?

A.      No, they haven't contacted my doctor . . . .

(Furshpan Decl., Ex. F at 134-35).

Plaintiff does not know if anyone in the MEU is aware that she filed a notice of claim or is involved in litigation. (Def. 56.1, ¶ 90, Plf. 56.1, ¶ 90).

Plaintiff performed assignments outside the scope of her assigned Hospital Squad duties on May 1, 2016 and September 21, 2016. (Def. 56.1, ¶ 94, Plf. 56.1, ¶ 94). However, it is "not unheard of" for deputy sheriffs to perform jobs outside the scope of their assigned duties. (Def. 56.1, ¶ 95, Plf. 56.1, ¶ 95). Indeed, although deputy sheriffs are assigned to particular squads or units, they can be, and often are, reassigned to other duties based upon the needs of the Sheriff's Office at the time. (Def. 56.1, ¶ 96, Plf. 56.1, ¶ 96). For example, there are times when no prisoners are in the hospital, so the deputies on Hospital Squad would be reassigned to other duties until they are needed back at the hospital. (*Id.*).

In December 2016, a list was posted for employees to indicate what they were bringing to the holiday party (the "holiday party list"), on which an unknown person made a handwritten notation, "grievance and lawsuit," next to plaintiff's name. (Def. 56.1, ¶ 92, Plf. 56.1, ¶ 92). Other personal comments were written next to several other names on the list as well, such as "anger," "a direct route to the [illegible]," "hate," "a cane w/ tennis balls on it," "detail # 2- Forced," and "Big Mouth [illegible]." (Furshpan Decl., Ex. N).

On October 18, 2016, a vacancy on Squad "A" opened due to another member leaving. (Def. 56.1, ¶ 62, Plf. 56.1, ¶ 62). Plaintiff moved to Squad "A," effective January 1, 2017, and is "happy" in her position and has no desire to transfer out. (Def. 56.1, ¶ 63, Plf. 56.1, ¶ 63).

B.    Procedural History

On April 14, 2017, plaintiff commenced this employment discrimination action against defendants under Title VII, the ADA, Section 1983 and the NYSHRL, alleging discrimination on the basis of her disability, gender and sex; retaliation; and deprivation of her right to equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution and Article I, Section 11 of the New York State Constitution. Issue was joined by the service of an answer on behalf of defendants on July 24, 2017.

Following the close of discovery, defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

III.    Discussion

A.  Standard of Review

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018) (quoting Fed. R. Civ. P. 56(a)); *accord Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184,

202 (2d Cir. 2007) (internal quotations and citations omitted); *see also Ricci v. DeStefano*, 557 U.S. 557, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) ("On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (emphasis added) (internal quotations and citation omitted). "A fact is material if it 'might affect the outcome of the suit under the governing law[.]'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the non-moving party," *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (quotations, alterations and citation omitted), and "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019) (quotations and citation omitted); *see also Hancock v. County of Rensselaer*, 882 F.3d 58, 64 (2d Cir. 2018) ("In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party.") "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505); *accord Nick's Garage, Inc. v. Progressive Casualty Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017). "Summary judgment dismissing a claim is inappropriate when the admissible materials in the record make it arguable that the claim has merit." *Davis-Garett*, 921 F.3d at 45. However, "[w]here the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci*, 557 U.S. at 586, 129 S. Ct. at 2677 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); *accord Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (quotations, brackets and citation omitted); *accord Jaffer*, 887 F.3d at 114. "[W]hen the moving party has carried its burden[,] . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [,]" *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (quoting *Matsushita Elec.*, 475 U.S. at 586-87, 106 S. Ct. 1348), and must offer "some hard evidence showing that its version of the events is not wholly fanciful[.]" *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (quotations and citation omitted). The nonmoving party can only defeat summary judgment "by adduc[ing] evidence on which the jury could reasonably find for that party." *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56 (2d Cir. 2012) (quotations, brackets and citation omitted). "'The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient' to defeat a summary judgment motion[,]" *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505); and "[a] court cannot credit a plaintiff's merely speculative or conclusory assertions." *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012); *see also Federal Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."); *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) ("While we are

required to resolve all ambiguities and draw all permissible factual inferences in favor of the non-moving party, . . . conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]" (quotations, alterations and citations omitted)). Since "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party[,] . . . [i]f the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505 (quotations and citations omitted).

Summary judgment is warranted, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016); *see also Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) ("[W]here the nonmoving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden [of showing the absence of a genuine dispute as to any material fact] by pointing to an absence of evidence to support an essential element of the nonmoving party's case[.]" (quotations, alterations and citation omitted)). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23, 106 S. Ct. 2548; *accord Crawford*, 758 F.3d at 486; *see also Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) ("Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become

immaterial and cannot defeat a motion for summary judgment.") "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548. Accordingly, when "the burden of persuasion at trial would be on the non-moving party . . . the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage*, 875 F.3d at 114 (quotations and citation omitted); *see also DeRogatis v. Bd. of Trs. of Welfare Fund of Int'l Union of Operating Eng'rs Local 15, 15A, 15C & 15D, AFLCIO ("In re DeRogatis")*, 904 F.3d 174, 187 (2d Cir. 2018) (holding that when the ultimate burden of proof at trial would be on the non-moving party, the moving party "may satisfy their burden of production under Rule 56 by negating an essential element of the [non-moving party's] claim, whether by submitting undisputed evidence to that effect or by demonstrating the insufficiency of the [non-moving party's] own evidence." (quotations, alterations and citation omitted)).

B. Discrimination Claims

Title VII makes it unlawful for an employer to discriminate against any individual "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "Claims of sex-based discrimination under Title VII and the NYHRL are analyzed using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36

L.Ed.2d 668 (1973)." *Walsh v. New York City Housing Auth.*, 828 F.3d 70, 74-75 (2d Cir. 2016); *see also Menaker v. Hofstra Univ.*, --- F.3d. ---, 2019 WL 3819631, at *4 (2d Cir. Aug. 15, 2019) ("Because it is often difficult to obtain direct evidence of discriminatory intent, we employ a 'burden-shifting framework' (commonly identified by reference to the Supreme Court case from which it derives, *McDonnell Douglas Corp. v. Green*)[] to progressively sharpen the inquiry into the elusive factual question of intentional discrimination." (quotations, alterations and footnotes omitted)). At the first step of the *McDonnell Douglas* framework, the plaintiff "must establish a *prima facie* case of sex discrimination by demonstrating that (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."[4] *Walsh*, 828 F.3d at 75 (quotations and citation omitted). Defendants challenge only the third and fourth elements with respect to plaintiff's Title VII discrimination claim.

Disparate treatment claims under the ADA are also evaluated under the *McDonnell Douglas* burden-shifting framework. *See Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019). "To satisfy the first step of the *McDonnell Douglas* burden shifting framework and establish a *prima facie* case of discrimination based on disparate treatment, [the plaintiff] 'must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered

---

[4] The same analytical framework applies to claims under the NYSHRL. *See Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App'x 54, 56 n. 3 (2d Cir. June 17, 2016) (summary order) (citing *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010)).

adverse employment action because of his disability.'" *Id.* (quoting *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013)). Defendants challenge only the latter element.

Moreover, since "[t]he Fourteenth Amendment provides public employees with the right to be free from discrimination[,] . . . public employees aggrieved by discrimination in the terms of their employment may bring suit under 42 U.S.C. § 1983 against any responsible persons acting under color of state law." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (quotations and citations omitted). A Section 1983 claim requires the plaintiff to establish two (2) elements: "(1) the violation of a right secured by the Constitution and laws of the United States, and (2) the alleged deprivation was committed by a person acting under color of state law." *Id.* at 87-88 (quotations and citation omitted). The basic elements of a Section 1983 disparate treatment claim are similar to such claims under Title VII, *i.e.*, "a plaintiff claiming disparate treatment under either statute must . . . [establish] that she suffered an 'adverse employment action' taken 'because of' her sex. . . ."[5] *Naumovski v. Norris*, 934 F.3d 200, 2019 WL 3770193, at * 5 (2d Cir. Aug. 12, 2019).

---

[5] Despite their similarities, there are several differences between Section 1983 and Title VII claims: (1) "a plaintiff advancing a claim pursuant to § 1983 must plausibly allege that 'the alleged deprivation was committed by a person acting under color of state law[,]' [but] Title VII has no such requirement[;]" (2) "unlike a Title VII claim, which may be brought only against the employing entity, a § 1983 claim can be brought against any individual responsible for the discrimination[;]" (3) "while an employer may be liable under Title VII for any discriminatory conduct that can properly be attributed to the employer through agency principles,[] § 1983 does not permit such vicarious liability[;]" and (4) the "lessened causation standard" incorporated in Title VII's antidiscrimination provision, requiring merely that the protected characteristic be a "motivating factor" for an employment practice, is not applicable to Section 1983 claims, which require a "but-for" causation standard. *Naumovski*, 934 F.3d 200, 2019 WL 3770193, at *6-7 (quotations and citations omitted). Nonetheless, Section 1983 discrimination claims remain subject to the *McDonnell Douglas* burden-shifting framework, although "at the third step of the *McDonnell Douglas* analysis, a plaintiff asserting a § 1983 claim bears a higher burden in establishing that the employer's alternative, nondiscriminatory reason for the adverse employment action is 'pretextual.'" *Id.*, 934 F.3d 200, 2019 WL 3770193, at * 7.

Similarly, "the ADA requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action[;]" the "motivating factor" standard does not apply to ADA claims. *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. Apr. 18, 2019) (summary order). However, for purposes of this motion, the Court assumes, without deciding, that Title VII's "motivating factor" standard applies to

23

"The burden of establishing a *prima facie* case is not onerous, and has been frequently described as minimal." *Walsh*, 828 F.3d at 75 (quoting *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) (internal quotation marks omitted)); *see also Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (holding that the burden of establishing a *prima facie* case of discrimination is "*de minimis*: it is neither onerous, nor intended to be rigid, mechanized or ritualistic." (quotations and citation omitted)). "Nonetheless, a plaintiff's case must fail if she cannot carry this preliminary burden." *Beyer*, 524 F.3d at 163; *see also Fahrenkrug*, 652 F. App'x at 56 (holding that the failure to establish any one of the necessary elements for a *prima facie* case of discrimination mandates dismissal of the plaintiff's claims).

"If the plaintiff successfully establishes a *prima facie* case, 'the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action.'" *Walsh*, 828 F.3d at 75 (quoting *United States v. Brennan*, 650 F.3d 65, 93 (2d. Cir. 2011) (internal quotation marks omitted)); *accord Menaker*, 2019 WL 3819631, at * 4. With respect to plaintiff's Title VII discrimination claim, "[i]f the employer carries that burden, 'the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" *Walsh*, 828 F.3d at 75 (quoting *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)); *see also Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (holding that once the employer articulates a legitimate, nondiscriminatory reason for its actions, "the burden then shifts back to the plaintiff to show that the employer's

---

plaintiff's NYSHRL discrimination claims. *See, e.g. Parsons v. JPMorgan Chase Bank, N.A.*, No. 16-cv-0408, 2018 WL 4861379, at * 6 (E.D.N.Y. Sept. 30, 2018) ("It remains an open question in this Circuit whether 'but for' causation is required in order to prove pretext under NYSHRL.")

explanation is a pretext for . . . discrimination. . . . [O]nce the employer has made a showing of a neutral reason for the complained of action, to defeat summary judgment [] the employee's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination." (quotations, alterations and citations omitted)).

With respect to plaintiff's Section 1983 and ADA claims, which, as noted above, do not incorporate Title VII's "lessened causation standard," *Naumovski*, 934 F.3d 200, 2019 WL 3770193, at *6-7 (quotations and citations omitted), once the employer articulates a legitimate, nondiscriminatory reason for the employment action, the burden shifts back to plaintiff to establish by facts admissible in evidence that "the employer's stated reason would not, alone, constitute a *sufficient* basis for pursuing an adverse action." *Naumovski*, 934 F.3d 200, 2019 WL 3770193, at *7 (emphasis in original). "In other words, a § 1983 [or ADA] plaintiff must establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action." *Id.*

"The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff, . . . and the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred[.]" *Johnson v. Schmid*, 750 F. App'x 12, 16 (2d Cir. Sept. 7, 2018) (summary order) (quotations and citations omitted); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) ("Under the *McDonnell Douglas* scheme, establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. . . . To establish a

'presumption' is to say that a finding of the predicate fact (here, the prima facie case) produces a required conclusion in the absence of explanation" (here, the finding of unlawful discrimination). . . . Thus, the *McDonnell Douglas* presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case—*i.e.*, the burden of producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason. . . . The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. . . . It is important to note, however, that although the *McDonnell Douglas* presumption shifts the burden of production to the defendant, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." (quotations, alterations, emphasis and citations omitted)).

### 1. *Prima Facie* Discrimination Claim

#### a. Adverse Employment Action

"An adverse employment action is 'a materially adverse change in the terms and conditions of employment.'" *Fahrenkrug*, 652 F. App'x at 56 (quoting *Sanders v. NYC Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)); *accord Davis v. New York City Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015). "An adverse employment action 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities and might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities,

or other indices [] unique to a particular situation.'" *Fox*, 918 F.3d at 71-72 (quoting *Patrolmen's Benevolent Ass'n of City of N.Y. v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002)).

"A denial of a transfer may also constitute an adverse employment action, but [the Second Circuit] require[s] a plaintiff to proffer objective indicia of material disadvantage; 'subjective, personal disappointment[ ]' is not enough." *Beyer*, 524 F.3d at 164 (third brackets in original) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)). Thus, "an employee has established the 'adverse employment action' necessary to make out a *prima facie* case when she has proffered evidence from which a reasonable trier of fact could conclude that the transfer sought and denied would have involved an objective and significant improvement in the terms, conditions, or privileges of her employment." *Id.* at 166. In other words, there must be "objective indicia that the transfer denial 'created a materially significant disadvantage' in the working conditions of the aggrieved employee." *Id.* at 164 (quoting *Williams*, 368 F.3d at 128).

Based upon the facts in the record that would be admissible in evidence, *see* Fed. R. Civ. P. 56(c), no rational jury could reasonably conclude that plaintiff was subjected to an adverse employment action. Plaintiff did not suffer any decrease in benefits, wages or salary; significant reduction in job responsibilities; loss of prestige, rank or opportunity for career advancement; or any other material change to the terms and conditions of her employment as a result of the denial of her transfer requests in August 2015; and there is no evidence in the record from which a rational juror could reasonably conclude that any of the three (3) positions to which plaintiff sought reassignment, *i.e.*, the Rotating Hospital Squad, the Midnight Hospital Squad or the Main Squad, "would have involved objective and significant improvements in her conditions of

27

employment." *Beyer*, 524 F.3d at 164. *See, e.g. Torres v. New York City Dep't of Educ.*, No. 18-cv-2156, 2019 WL 2124891, at *6 (E.D.N.Y. May 15, 2019) ("[T]he denial of a request to transfer, where there are [sic] no significant change in duties or opportunities for advancement, does not constitute an adverse employment action."); *Ortiz v. Montefiore Hosp.*, No. 18-cv-4857, 2019 WL 1903366, at * 4 (E.D.N.Y. Apr. 29, 2019) ("While denials of transfers may constitute an adverse employment action, it is only so when the transfer sought was not merely a lateral transfer, but, rather, was a transfer to an objectively better position. . . . The plaintiff sought transfers to a different shift or a different location, but does not suggest that these transfers would have put her in an objectively better position. (quotations and citations omitted)); *Attali v. City of New York*, No. 15-cv-426, 2018 WL 6597500, at * 5 (S.D.N.Y. Sept. 17, 2018) (finding that the defendant's denial of the plaintiff's transfer requests did not constitute an adverse employment action because the plaintiff "did not seek to be transferred to a position that was objectively and materially better than the position he occupied, . . . but rather, to a comparable position . . . ." (quotations, alterations and citations omitted)); *cf. Beyer*, 524 F.3d at 165 ("The denial of a transfer may constitute an adverse employment action at the *prima facie* step of discrimination analysis when . . . a plaintiff adduces sufficient evidence to permit a reasonable factfinder to conclude that the sought for position is materially more advantageous than the employee's current position, whether because of prestige, modernity, training opportunity, job security, or some other objective indicator of desirability.") Indeed, before she returned to work, plaintiff was told that she "would stay in the temporary spot until a permanent position [came] out," (Furshpan Decl., Ex. E at 87), *i.e.*, she would not be returned to her previous position in the District Court notwithstanding Lettieri's return from maternity leave; and less than three (3)

weeks after she returned to work, plaintiff was offered one (1) of the three (3) permanent

positions to which she had requested transfer, *i.e.*, the position of her second choice on the

Midnight Hospital Squad, but she declined that offer in favor of remaining at her "temporary"

position on the Rotating Hospital Squad. (Def. 56.1 ¶ 60; Plf. 56.1, ¶ 60). Plaintiff remained in

the same "temporary" position, without any real threat of removal or reassignment, until her

position on Rotating Hospital Squad became permanent on June 6, 2016. (Def. 56.1, ¶ 61; Plf.

56.1, ¶ 61).

      Absent any objective indicia in the record that the denial of plaintiff's transfer request

created any materially significant disadvantage in the terms and conditions of her employment,

plaintiff's evidence is insufficient to establish an essential element of her discrimination claims

*i.e.*, that she was subject to an adverse employment action. Since the evidence shows no more

than plaintiff's "subjective, personal disappointment," *Beyer*, 524 F.3d at 165, in the denial of

her transfer request, plaintiff cannot establish a *prima facie* case of discrimination under Title

VII, the ADA, the NYSHRL or Section 1983. *See, e.g. Fairbrother v. Morrison*, 412 F.3d 39, 56

(2d Cir. 2005) ("Without a real change in the conditions of employment, a transfer is only a mere

inconvenience or an alteration of job responsibilities, and hence not materially adverse. . . . [I]f a

transfer is truly lateral and involves no significant changes in an employee's conditions of

employment, the fact that the employee views the transfer either positively or negatively does

not of itself render the denial or receipt of the transfer an adverse employment action"

(quotations, alterations and citations omitted)), *abrogated on other grounds by Burlington N. &*

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006); *Delgado v.*

*City of Stamford*, No. 3:11-cv-1735, 2015 WL 6675534, at * 13 (D. Conn. Nov. 2, 2015)

(holding that where the plaintiff failed to proffer sufficient objective indicia of material disadvantage, and her transfer was lateral and involved no change in pay or rank, the plaintiff "must show that her transfer was a setback to her career and [a] materially significant disadvantage" to constitute an adverse employment action (quotations and citation omitted)). Accordingly, defendants have established their entitlement to judgment as a matter of law dismissing plaintiff's discrimination claims under Title VII, the ADA, Section 1983 and the NYSHRL in their entirety with prejudice.

### b. Inference of Discrimination

Plaintiff also failed to demonstrate that the denial of her transfer requests occurred under circumstances giving rise to an inference of discrimination because of her sex or gender.

Contrary to defendants' contention that "there can be no inference of gender discrimination" because one (1) of the three (3) positions to which plaintiff sought reassignment was awarded to another female, and defendants also denied Bartz's transfer request for the same reason, (Defendants' Memorandum of Law in Support of Motion for Summary Judgment ["Def. Mem."] at 14), those facts are not necessarily dispositive; they are merely factors to be considered. *See Village of Freeport v. Barrella*, 814 F.3d 594, 601 n. 9 (2d Cir. 2016) ("[T]he fact that an employer favored someone outside of the relevant protected class will ordinarily suffice to sustain an inference of discrimination. . . . Conversely, a plaintiff who cannot show an employer's preference for a person not of the plaintiff's protected class will usually be unable to sustain a claim of disparate treatment. . . . But we have nonetheless suggested that a plaintiff may be able to plead a *prima facie* case under Title VII even without showing that the defendant

favored someone outside of the plaintiff's protected class." (quotations, alterations and citations omitted)); *Brown v. Henderson*, 257 F.3d 246, 253-54 (2d Cir. 2001) ("In determining whether an employee has been discriminated against 'because of *such individual's* ... sex,' 42 U.S.C. § 2000e–2(a)(1) (emphasis added), the courts have consistently emphasized that the ultimate issue is the reasons for *the individual plaintiff's* treatment, not the relative treatment of different *groups* within the workplace. . . . As a result, discrimination against one employee cannot be cured, or disproven, solely by favorable, or equitable, treatment of other employees of the same race or sex. . . . Similarly, the application of discriminatory policies to individuals cannot be justified by their even-handed effects on women and men as classes or in the aggregate. . . . And, whether an employer discriminates against only a subset of a protected class, . . . or discriminates inconsistently, Title VII nevertheless protects any individual so long as that individual is mistreated because of her sex. . . . Thus, though it is helpful in proving sex discrimination, we have held that it is not strictly necessary for a plaintiff to identify an employee who was treated more favorably than the plaintiff and who was similarly situated to the plaintiff, except for being of the opposite sex. . . . In other words, what matters in the end is not how the employer treated *other* employees, if any, of a different sex, but how the employer *would have* treated *the plaintiff* had she been of a different sex." (emphasis in original) (quotations and citations omitted)); *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 27 (E.D.N.Y. 2015) ("Where an employer replaces a member of the protected class with another member of the protected class, that fact may undermine any inference of discrimination. . . . However, this fact is not dispositive, and the focus remains on whether the plaintiff lost out *because of* [her gender or sex]." (emphasis in original) (quotations and citations omitted)).

"That being said, in the absence of evidence suggesting that a plaintiff's sex was relevant, the fact that both male and female employees are treated similarly, if badly, does give rise to the inference that their mistreatment shared a common cause that was unrelated to their sex." *Brown*, 257 F.3d at 254; *see, e.g. Gordon v. City of New York*, 612 F. App'x 629, 632 (2d Cir. May 21, 2015) (summary order) (finding that the fact that both of the plaintiffs were subjected to similar treatment, while one is a black woman and the other is a white man, undermined both of their hostile work environment claims); *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 117 (2d Cir. Mar. 25, 2010) (summary order) (finding that the plaintiff could not establish "that the circumstances surrounding her termination g[a]ve rise to an inference of discrimination" because she "was replaced by another black female . . . [who] was hired at the same time that [the plaintiff] was fired, before [she] took any legal action against defendants." (emphasis omitted)). Thus, even if the denial of plaintiff's transfer request constitutes an adverse employment action, she failed to establish a *prima facie* case of gender or sex discrimination since, *inter alia*, the record is bereft of any facts that would be admissible in evidence from which a rational juror could reasonably find that her sex or gender was relevant to Sharkey's determination not to transfer her to any of the three (3) positions she sought in July and August 2015; one (1) of those positions was given to another woman; and plaintiff was treated the same as Bartz, a similarly situated male whose transfer requests were also denied because he was out on indefinite medical leave. Accordingly, defendants demonstrated their entitlement to judgment as a matter of law on plaintiff's Title VII and NYSHRL gender and sex discrimination claims on this basis as well.

2. Defendants' Legitimate, Nondiscriminatory Reasons

Even if plaintiff established a *prima facie* case of discrimination, defendants have articulated a legitimate, nondiscriminatory reason for the denial of her transfer requests, *i.e.*, because she was on indefinite leave at the time the positions to which she sought reassignment were posted and filled and, thus, did not "possess the minimum qualifications for the job," as provided in Section 26 of the CBA. *See, e.g. Williams*, 368 F.3d at 129 ("Where, as here, the applicant has taken an indefinite leave of absence, and has given no indication of when she will return to the workplace, she need not be considered available to fill a position for which there is an immediate need, and will be deemed unqualified."); *Anderson v. Eastern Connecticut Health Network, Inc.*, No. 3:12-cv-00785, 2015 WL 4393552, at * 10 (D. Conn. July 16, 2015), *aff'd*, 668 F. App'x 378 (2d Cir. Aug. 29, 2016) (finding that a condition which prevented the plaintiff "from performing the basic functions of his job for an indefinite period of time" constituted a legitimate, nondiscriminatory explanation for the defendants' action).

In opposition, plaintiff failed to satisfy her burden of showing, by facts that would be admissible in evidence, circumstances from which a rational finder of fact could reasonably infer that defendants' stated reason for the denial of her transfer requests was pretextual, *i.e.*, that the denial of plaintiff's transfer requests "was more likely than not based in whole or in part on discrimination" because of her gender or disability.[6] *Walsh*, 828 F.3d at 75 (quoting *Feingold*, 366 F.3d at 152). The record is bereft of any evidence from which it may reasonably be inferred that defendants' "stated non-discriminatory reason was not the exclusive reason" for the denial

---

[6] Since plaintiff did not satisfy her burden of establishing pretext under Title VII, *i.e.*, that discrimination played any role in the denial of her transfer request, she has also failed to satisfy the "higher burden" for establishing pretext under Section 1983 and the ADA.

of plaintiff's transfer requests. *Naumovski*, 934 F.3d 200, 2019 WL 3770193, at * 7 (emphasis omitted). Accordingly, the branches of defendants' motion seeking summary judgment dismissing plaintiff's discrimination claims pursuant to Rule 56 of the Federal Rules of Civil Procedure are granted and defendants are granted judgment as a matter of law dismissing plaintiff's discrimination claims under Title VII, the ADA, Section 1983 and the NYSHRL in their entirety with prejudice.

C. Retaliation Claims

The antiretaliation provision of Title VII provides, in relevant part, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "Retaliation claims under Title VII are analyzed pursuant to the well-known *McDonnell Douglas* burden-shifting framework." *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018); *accord Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014). "In order to show a *prima facie* case of retaliation in response to a motion for summary judgment, a plaintiff must submit sufficient admissible evidence to allow a trier of fact to find: (i) conduct by the plaintiff that is protected activity under Title VII; (ii) of which the employer was aware; (iii) followed by an adverse employment action of a nature that would deter a reasonable employee from making or supporting a discrimination claim; (iv) that was causally connected to the protected activity." *Cox v. Onondaga County Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014); *accord Shultz v.*

34

*Congregation Shearith Israel of City of New York*, 867 F.3d 298, 309 (2d Cir. 2017). "A plaintiff seeking to demonstrate that he engaged in protected activity need not show that the behavior he opposed in fact violated Title VII; he must, however, show that he possessed a good faith, reasonable belief, . . . that the employer's conduct qualified as an 'unlawful employment practice' under the statute[.]" *Cooper v. New York State Dep't of Labor*, 819 F.3d 678, 680-81 (2d Cir. 2016) (quotations and citations omitted).

Plaintiff's ADA, Section 1983 and NYSHRL retaliation claims are also reviewed under the *McDonnell Douglas* burden-shifting framework. *Vega*, 801 F.3d at 91 (Section 1983); *Zann Kwan*, 737 F.3d at 843 (NYSHRL); *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (ADA).

"Once the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Zann Kwan*, 737 F.3d at 845; *accord Cox*, 760 F.3d at 145. "Once the employer has done so, the employee may prevail by demonstrating that the stated rationale is mere pretext." *Cox*, 760 F.3d at 145; *see also Zann Kwan*, 737 F.3d at 845 ("Under the *McDonnell Douglas* framework, after the defendant has articulated a non-retaliatory reason for the employment action, the presumption of retaliation arising from the establishment of the prima facie case drops from the picture. . . . The plaintiff must then come forward with [evidence that the defendant's proffered,] non-retaliatory reason is a mere pretext for retaliation." (citation omitted)).

1.  Adverse Employment Action

"In the context of retaliation, 'adverse employment action' is broader than it is in the context of discrimination." *Shultz*, 867 F.3d at 309; *accord Vega*, 801 F.3d at 90. "[T]he antiretaliation provision, unlike the substantive [antidiscrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). Nonetheless, "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67, 126 S. Ct. 2405. "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68, 126 S. Ct. 2405 (quotations and citations omitted); *see also Davis-Garett*, 921 F.3d at 44 ("[T]he proper question for a retaliation claim is "whether the alleged adverse action to which the plaintiff was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." (quotations, alterations and citation omitted)); *Shultz*, 867 F.3d at 309 ("[T]he employer's conduct must be harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination." (quotations, alterations and citation omitted)).

The term "material adversity" is utilized "to separate significant from trivial harms[,]" because "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *White*, 548 U.S. at 68, 126 S. Ct. 2405; *see also Shultz*, 867 F.3d at 309 ("Actions that are 'trivial harms'-- i.e., those petty slights or minor annoyances that often take

place at work and that all employees experience-- are not materially adverse." (quotations and citations omitted)). "Title VII does not set forth a general civility code for the American workplace." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (quotations and citation omitted).

"Material adversity is to be determined objectively, based on the reactions of a reasonable employee." *Tepperwien*, 663 F.3d at 568; *accord Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014). "[T]he standard is phrased in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *White*, 548 U.S. at 69, 126 S. Ct. 2405. "[A]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct[.]" *Rivera*, 743 F.3d at 25 (quotations and citation omitted). The standard "does not require a reviewing court or jury to consider the nature of the discrimination that led to the filing of the charge. . . . Rather, the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint." *White*, 548 U.S. at 69, 126 S. Ct. 2405 (quotations and citation omitted); *see also Vega*, 801 F.3d at 91 ("Retaliation occurs when an employer takes action against an employee not because of his [protected characteristic], but because he engaged in protected activity-- complaining about or otherwise opposing discrimination.")

The complaint alleges the following acts of retaliation: (i) that plaintiff was left without a designated unit vehicle and was twice required to perform assignments outside the scope of her assigned duties on the Hospital Squad as a result of being assigned as a third deputy to a two (2)-person squad, (Def. 56.1, ¶ 94; Plf. 56.1, ¶ 94; Compl., ¶¶ 36, 48-49); (ii) that on three (3) or four

(4) occasions, including but not limited to on or about October 12, 2015, October 16, 2015 and November 1, 2016, plaintiff was required to sit in the back of a unit vehicle, behind the prisoner partition, because the front seats of the unit vehicle which picked her up for work were already occupied, (Def. 56.1, ¶¶ 69, 72-74, 82; Plf. 56.1, ¶¶ 69, 72-74, 82; Compl., ¶ 40); (iii) that on six (6) occasions between May 5, 2016 and November 14, 2016, a unit vehicle was late to pick plaintiff up for work, although she did not lose any pay as a result thereof, (Def. 56.1, ¶¶ 80-81; Plf. 56.1, ¶¶ 80-81); (iv) that commencing in or about June 2016, plaintiff's sergeant told her to call him the day before each work shift to ascertain which unit would take her into work, and he once cancelled an overtime request plaintiff made while pre-authorizing an overtime request made by Risley, but he did so because Risley had to drive out of his way to pick plaintiff up for work, (Def. 56.1, ¶¶ 78-79, 83-84; Plf. 56.1, ¶¶ 78-79, 83-84); (v) that in July 2016, the MEU investigated a sick leave that plaintiff took, (Def. 56.1, ¶ 88; Plf. 56.1, ¶ 88); (vi) that on three (3) occasions during plaintiff's month-long vacation in August 2016, she, together with others in the Hospital Squad, worked overtime in the Transportation Department, after she had requested "manpower overtime," *i.e.*, to work overtime in any department or unit of the Sheriff's Office that needed assistance, (Def. 56.1, ¶¶ 85-87; Plf. 56.1, ¶¶ 85-87; Compl., ¶ 43); and (vii) that in or about mid-December 2016, a list was posted in a communal area for deputies to indicate what items they would bring to the holiday party, on which an unknown person made the handwritten

notation, "grievance and lawsuit," next to plaintiff's name.[7] (Def. 56.1, ¶ 92; Plf. 56.1, ¶ 92;

Compl., ¶¶ 46-47). However, in her opposition to defendants' motion, plaintiff asserts only that

her "relegat[ion] to the prisoner partition of Department vehicles" and "the public derision she

was subjected to on the Holiday Party List," were the purportedly retaliatory acts "directly

related to her charges of discrimination," (Plf. Mem. at 8); seemingly abandoning her claims

involving any of the other adverse acts alleged in her complaint.[8]

Considered both separately and in the aggregate, no rational jury could find that a

reasonable employee would likely be dissuaded by the challenged conduct from making or

supporting a charge of discrimination against her employer. At best, the acts challenged by

plaintiff consist of minor annoyances and petty slights occurring intermittently over the course of

an approximately fifteen (15)-month period. Indeed, plaintiff was not treated differently from

---

[7] Additionally, in her opposition to defendants' motion, plaintiff asserts that she "suffered an adverse employment action in that she was passed over for transfer into a permanent position in favor of deputies that had less seniority." (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ["Plf. Mem."] at 7). However, plaintiff was "passed over" for transfer when the positions she sought were filled by others on or before August 21, 2015. The only protected activity alleged by plaintiff is her service of a notice of claim on or about September 25, 2015, more than one (1) month thereafter. "There can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity." *Pinero v. Long Island State Veterans Home*, 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005); *see, e.g. Moy v. Perez*, 712 F. App'x 38, 40 (2d Cir. Oct. 11, 2017) (summary order) (concluding that since the decision not to promote the plaintiff was made before the plaintiff engaged in any protected activity, the plaintiff's retaliation claim failed because he did not "allege prior participation in a protected activity."); *Laface v. Eastern Suffolk Boces*, 349 F. Supp. 3d 126, 149-50 (E.D.N.Y. 2018) (finding that a transfer decision which occurred prior to the alleged protected activity cannot be an adverse employment action).

[8] In any event, it is "not unheard of" for deputy sheriffs to perform duties outside the scope of their assigned duties based upon the needs of the Sheriff's Office, (Def. 56.1, ¶¶ 95-96; Plf. 56.1, ¶¶ 95-96); other deputy sheriffs on the Hospital Squad worked overtime in the Transportation Department in August 2016, (Def. 56.1, ¶ 85; Plf. 56.1, ¶ 85); the very purpose of the MEU is to investigate chronic sick leaves, workers' compensation claims and other matters, (Def. 56.1, ¶ 89; Plf. 56.1, ¶ 89); plaintiff did not suffer any injury or harm as a result of, *inter alia*, being late to work on the six (6) occasions when the unit vehicle assigned to pick her up for work was late, having to call her sergeant to get a ride or having her sick leave investigated; and the record is devoid of any evidence indicating that either plaintiff's sergeant or the MEU were aware that plaintiff had served a notice of claim. (Def. 56.1, ¶¶ 79, 90; Plf. 56.1, ¶¶ 79, 90).

any other employee, as it is undisputed that between September 9, 2015 and February 23, 2015, male deputy sheriffs rode in the back of a unit vehicle, behind the prisoner partition, on at least fifty-four (54) occasions, (Def. 56.1, ¶ 70; Plf. 56.1, ¶ 70); and there were personal comments handwritten next to several other names on the holiday party list as well. (Furshpan Decl., Ex. N). Since the evidence is insufficient to support a finding that plaintiff was subjected to a materially adverse action, plaintiff failed to establish a *prima facie* case of retaliation. Accordingly, the branches of defendants' motion seeking summary judgment dismissing plaintiff's retaliation claims against them pursuant to Rule 56 of the Federal Rules of Civil Procedure based upon plaintiff's failure to establish that she was subjected to a materially adverse action are granted, and defendants are granted judgment as a matter of law dismissing plaintiff's retaliation claims under Title VII, the ADA, Section 1983 and the NYSHRL in their entirety with prejudice.[9]


IV.    Conclusion

For the reasons set forth above, defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is granted and defendants are granted judgment as a matter of law dismissing plaintiff's claims against them in their entirety with prejudice. The Clerk of the Court shall enter judgment in favor of defendants and close this case.

SO ORDERED.

_____/s/ *Sandra J. Feuerstein*_____
Sandra J. Feuerstein
United States District Judge

Dated:  September 11, 2019
        Central Islip, New York

---

[9] In light of this determination, it is unnecessary to consider defendants' remaining contentions.